Wan am aker, J.,
dissenting. I decisively dissent, not only from the judgment in this case, but also the syllabus, as well as the majority opinion by which it is sought to sustain such judgment and syllabus.
A decent regard for the inherent importance of-the questions involved and the widespread state and national interest in the same, as well as a due respect for the majority opinion, demand more than a brief statement of the grounds of disagreement.
Let us start from some generally admitted ancient landmarks as to which we are aptly admonished in the Ohio constitution of 1802, Section 18 of the Bill of Rights: “That a frequent recurrence to the fundamental principles of civil *126 government, is absolutely necessary to preserve the blessings of liberty.”
■ The cornerstone of American government is found in that fundamental principle: “All political power is inherent in the people.” Constitution of Ohio, 1802, Bill of Rights, Article VIII, Section 1; Constitution of Ohio, 1851, Bill of Rights, Article I, Section 2.
A few primary principles of political power and good government from the American viewpoint may furnish common ground for our consideration and help to clear some hazy notions as to political rights and powers, to the end that we may better understand the present status of our Ohio cities and villages.
In every American municipality to-day there are being exercised three distinct and differentiated kinds of political power:
First, municipal, that deals with purely municipal affairs; second, state, that deals with purely state affairs; third, national, that deals with purely national affairs.
The national power is now and always has been supreme in its own proper jurisdiction.
The state power is now and always has been supreme in its own proper jurisdiction.
The municipal power—quaere—but why not supreme in its own proper jurisdiction?
In point of time, which of these three great political powers was first in existence and operation—national, state, or municipal?
Manifestly, all must agree that we had towns, villages and cities exercising the powers of local self-government a long time before we had a *127 state to exercise the state power or a nation to exercise the national power. This historic fact is so self-evident that it would seem unnecessary to support it’ by distinguished authority. However, to please those who pride themselves on precedent, let .us note the following very eminent authorities: Cooley’s Const. Lim. (7 ed.), 65; 1 McQuillin on Munic. Corps., 156; 1 Dillon (5 ed.), Sec. 14, et seq.; C. W. & Z. Rd. Co. v. Commissioners, 1 Ohio St., 77; Cass v. Dillon, 2 Ohio St., 630.
An even stronger case on the right of local .self-government is that of People v. Hurlbut, 24 Mich., 45, and I specially enjoin upon all students of municipal rule to carefully read the very able opinions of the various judges in that case, especially Campbell’s and Cooley’s. I quote briefly from page 98:
“Our constitution has been adopted in view of a system of local government, well understood and tolerably uniform in character, existing from the very earliest settlement of the country, never for a moment suspended or displaced, and the continued existence of which is assumed; and, second, the liberties of the people have generally been supposed to spring from, and be dependent upon, that system. * * * The doctrine that within any general grant of legislative power by the constitution there can be found authority thus to take from the people the management of their local concerns, and the choice, directly or indirectly, of their local officers, if practically asserted, would be somewhat startling to our people, and would be likely to lead hereafter to a more careful *128 scrutiny of the charters of government framed by them, lest some time, by an inadvertent use of words, they might be found to have conferred upon some agency of their own, the legal authority to take away their liberties altogether.”
If that be true as to the selection of local officers, how much more then would it be true as to the designation of powers that they might exercise? To the same effect, 28 Mich., 228.
If, now, we had and exercised municipal powers in matters of local self-government before we had a state and before we had a nation, how came we to lose those powers? Who took them away from us? Who perchance surrendered them, and to whom ?
Is there, in the national constitution, any denial or limitation of the powers exercised by the many municipalities that were in existence all over the nation at the time and prior to the adoption of the national constitution ? ■ Certainly not.
The state constitution declares and defines the state powers, save as they are denied and limited by the national constitution. But does that same state constitution deny or limit the powers of local self-government in existence and in exercise by the cities and villages of the Ohio territory at the time the state was organized and the constitution adopted? If so, where is it provided that the power of local self-government henceforth, that is, after the adoption of the constitution, shall be denied or otherwise limited to the cities and villages of Ohio? Point out the article and the section.
*129 Our state constitutions are composed only of delegated powers. You say: “How do you know that?” Well, the constitutions themselves ought to be pretty trustworthy .witnesses on that elementary proposition.
“To guard against the transgression of the high powers, which we have delegated, we declare, that all powers, not hereby delegated, remain with the people.” Ohio constitution, 1802, Bill of Rights, Section 28.
“This enumeration of rights shall not be construed to impair or deny others retained by the people; and all powers, not herein delegated, remain with the people.” Ohio constitution, 1851, Bill of Rights, Section 20.
If, now, any municipal powers were granted to the legislature or conferred upon it by the constitution, it would probably appear with tolerable clearness.
It is highly significant that there is no reference here whatsoever to municipalities, either as villages or cities. They are not even mentioned anywhere in the constitution of 1802. Hence, it cannot be said that the people intended in that constitution to deprive the numerous towns and villages of the state of their right of local self-government and transfer such right and power to the legislature. If such a radical departure from the then existing custom and law had been intended, is it not reasonable to suppose that there would have been at least some clear and apt constitutional reference thereto ?
How about the Ohio constitution .of 1851,?....
*130 The only reference in the constitution of 1851, that can possibly apply to legislative or state control of municipalities, is the following:
“Art. XIII, Sec. 6. The general assembly shall provide for the organization of cities, and incorporated villages, by general laws, and restrict their powers of taxation, assessment, borrowing money, contracting debts - and loaning their credit, so as .to prevent the abuse of such power.”
Clearly, this does not delegate to the general assembly the. right to confer powers. It recognizes the powers as then being exercised by cities and villages, and merely provides that the general assembly shall provide for organisation by general laws and restrict their power in the above respects -so as to prevent the abuse of such power. Cass v. Dillon, 2 Ohio St., 623.
Does not this provision to “restrict” their power concede the power as already existing without a legislative •' grant ?
What is' ¿leant by the word “restrict?” Does it mean prohibit? Does it mean deny? Or does it mean to give or grant, and then restrict? Nonsense 1
“Restrict: to' limit; bound; circumscribe; restrain; curb, or repress.” Web. Int. Diet.
And when they wrote into the constitution the word “restrict,” did they not in substance and effect provide that the legislature should exercise no other control over municipalities in respect to rnunicipal powers?

When the Fathers came to frame and adopt the constitution-of 1831, it would have been an easy matter then to have said that the municipalities 
*131
shall exercise no powers save .such as are granted expressly or impliedly by the- general assembly, especially in view of the fact that the constitution of 1802 significantly omitted all reference to villages or cities.

But they did not say that. They simply gave the legislature power to restrict certain municipal powers, not to confer them, so as to prevent an abuse of those powers. How could they-.restrict a power unless it theretofore existed?
Again, I ask, how did we lose the municipal power that was formerly enjoyed and exercised by our municipalities under the common law?
The state legislature, for over a century, has asserted and assumed, without constitutional right, to be the source of all municipal' power, and'in this has been stanchly and overwhelmingly' supported by our courts, which,', together with a century or more of acquiescence oh. the part of the people, has built up .a false system of. political power unintended ' and unthought of by the Fathers in reference to municipal rule..
By reason of the many years of legislative invasion and usurpation of the powers of -local self-government, believed, by the Fathers to be wisely left to the towns and villages as they were exercising them at the time the several constitutions of Ohio were adopted, there developed in widely different portions of the state a movement -to reclaim and restore this political power back into -the hands of the people, to prevent further aggressions on the part of the legislature, and to give the cities and villages of Ohio now what they had before any *132 constitution of the state was adopted, to-wit, full local self-government.
The legislatures of Ohio, sanctioned by our courts, have been responsible for this embezzlement of municipal power. Instead of standing on the original proposition that “all political power is inherent in the people,” the legal and logical effect of the position of the legislature of Ohio has been, “No political power for municipalities is inherent in the people save what the legislature sees fit to give them.”
To the average man, all political power means all political power, whether national, state, municipal, or otherwise. When the Fathers used this most comprehensive, qualifying- word “all” would it be likely that they intended to except from it municipal power—the one pozuer above all others that they first exercised, and the one that most intimately and directly touched their own home affairs three hundred and sixty-five days in the year? A mere statement of this proposition shows its absolute absurdity.
Our friends of the majority necessarily are forced into the position that “the legislature is the reservoir of all political power as to municipal rule and authorityI can well conceive how that could be by special grant expressed in the constitution. But the grant of legislative power to the general assembly- of Ohio was of state powers for state purposes, and not municipal power for municipal purposes and it did not include within its terms the surrender or deprivation of the municipal power that had always existed and had al *133 ways been exercised by the people before we had legislatures, constitutions and states.
The legislature was intended to do with the forms of government, forms of power, the ways and means of exercising and expressing them, as to powers actually delegated and nothing more.
Let us now proceed to analyze this Article XVIII. The intention of the dead man determines his will: the intention of living men should determine their will.
Paul, himself a great lawyer, but a greater master of language and logic, in his letter to the Corinthians, lays down a fundamental rule of construction that seems to fit the present case :• “Who also hath made us able ministers of the new testament; not of the letter, but of the spirit: for the letter killeth, but the spirit giveth life.” 2 Corinthians, 3 ch., 6 v.
Looking now for .the living potential will of the new constitution-makers and adopters, guided by Paul’s doctrine of the spirit and purpose that giveth life, let us apply one more primary rule of Blackstone:
1. The old law.
2. The mischief to be avoided.
3. The remedy intended to be provided.'
The old law, as applied by the legislature and sanctioned by the courts, was in substance that “municipalities have no power except such as given to them expressly or impliedly by legislative act.”
Though this doctrine has no foundation in common sense, common law, or constitution, it has been passively acquiesced in for a century.
*134 Petition after /petition addressed to the legislature, case after: case decided by the'courts, justified the -.hopelessness of home rule in local affairs through' either of these sources. Accordingly application- was made to the constitutional convention for a new declaration' of independence for municipalities. . \
The constitutional- coiivention, with great unanimity, in substance and effect declared that “municipalities are and of right ought to he free and independent in their municipal affairs
That this was their paramount and patriotic purpose there can be no doubt.
Did they accomplish that purpose for home rule, or shall it turn out at the last, by judicial interpretation, that this boasted independence and home rule is just -no ■ independence at all, and that the municipalities are still as hopelessly servile and subject to legislative control as ever, save and except that they may escape from further legislative interference or obstruction in the possibility of agreeing on some new charter for the village or city?
Did the people who asked bread get a brick, and that of the “gold”, variety, too, all under the label on the ballot: “Municipal Plome Rule?”
Is it possible that this home-rule amendment, so widely advertised through the constitutional convention and the campaigns that followed as a panacea for municipal ills, is, as a former statesman a half - century ago declared, just a “barren ideality”- as to 'dll villages and cities that are unwilling or unable to adopt a new form of government under a charter?
*135 Over three million of Ohio’s people are to-day living in more than one thousand cities and villages. A bare dozen have taken preliminary steps .for a new charter. All the rest will still continue to be helplessly dependent upon either an adjourned or an unfriendly legislature.
The smaller cities and villages constitute the great majority of municipalities, and the probabilities are that they are quite content with their present form of government and will not adopt a new charter. Then it must follow that the great majority of villages and cities must make their appeal to the legislature, and be just as absolutely helpless and dependent as they were before we had a home-rule amendment.
While examining and analyzing this home-rule amendment, Article XVIII, we must ever keep in mind the distinction between municipal power and state power.
Section 3 reads: “Municipalities shall have authority to exercise all powers of local self-government and - to adopt arid enforce within their limits such local police, sanitary and other similar regulations, as are not in-conflict with general laws.”
You will notice the italicized portion, which is clearly and absolutely a grant of full and immediate municipal power, unless the second part of this section, or some cognate sections, cut down or limit such power.
The second part of the section, “and to adopt such local police,” etc., regulations, deals with a state power and in no sense municipal power. The police power of the state, whether pertaining *136 to the public health or the public peace, has always been recognized by all authorities as essentially state police power. It is necessarily so. Why? Because we have riots disturbing the public peace, calling for the intervention of the state authorities, and we have epidemics requiring action of the state board of public health to protect neighboring and adjoining portions of the state. There can be no question about this grant of power being, in the first half of the section, a grant of municipal power to municipalities, and in the second half, a grant of state power to municipalities; the first unlimited in the section by the phrase “not in conflict with general laws,” the second part of the section being limited by such phrase, because it relates to a general state power and hence should be in harmony with general laws conferring and governing such power.
But some one says: I believe that “not in conflict with general laws” also qualifies the italicized part of Section 3. Well, if that be true, then municipal powers to-day are as absolutely under the control of the legislature as they were before the adoption of the home-rule amendment, and that, too, whether the cities adopt new charters or not. Why? Because the power of self-government provided for in Section 7 is the identical power conferred in Section 3. And if Section 3 must all the while and in all respects yield to general laws, it manifestly follows that Section 7 must do likewise.
“Sec. 7. Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of Section 3 of this *137 article, exercise thereunder all powers of local self-government.”
Certainly Section 7 in no wise cuts down the powers conferred by Section 3. ' It is nowhere provided in Section 7 that before powers of local self-government may be exercised under Section 3, a charter must first be framed and adopted. If it were so intended, is it not probable that some apt words such as, “before exercising the powers of local self-government as provided in Section 3, municipalities shall frame, or must frame and adopt, an amended charter for their government,” as is provided in the home-rule provisions of the constitutions of California, Minnesota, Missouri, Michigan and other states? That would have made it perfectly clear if they had so intended. But they evidently did not so intend. The grievance to which this home-rule amendment was directed was not so much to the forms of government as to the substance of government; not to the officers who should exercise the powers, but to the fact that there was no power to exercise, save by grace of the legislature.
Again, if the charter must first be adopted before Section 3 shall become self-executing, isn’t it strange that there is absolutely no limitation upon the kind of charter that the municipality may adopt? They may adopt anything that a majority see fit to adopt. It may be:
First, a most radical departure from our present form of government.
Second, it may be a slight amendment or alteration of the present form of government.
*138 Third, it may simply be a recodification of our present law pertaining to municipalities.
In either event, if the charter is adopted, according to the contention of the majority, home rule becomes at once available. In the last two classes of cases, though there is no substantial change in the political machinery for carrying out the provisions and exercising the powers under this amendment, still, because they got a paper writing called a charter, or a municipal constitution, a new spring political dress, so to speak, they may now exercise the municipal powers conferred by Section 3. But all the. villages and cities which are unable to agree upon a charter, or are unwilling to make any change because of their satisfaction with their present municipal form, all these are denied home rule by this sort of judicial interpretation.
Section 2 of the amendment is not a restraint upon municipal corporations in any wise, except they shall be subject in the first instance to general laws as to their incorporation and preliminary government. The restrictions are rather upon the legislature suspending the operation of their laws until they shall be ratified by the people. .
There is a section, however, of the amendment that does undertake to limit the municipal power of municipalities, and must be read in connection with Section 3 and Section 7. Section 13 reads as follows:
“Sec. 13. Laws may be passed to limit the power of municipalities to levy taxes and incur debts for local purposes, and may require re *139 ports from municipalities as to their financial condition and transactions, in such form as maybe provided by law, and may provide for the examination of the vouchers, books and accounts of all municipal authorities, or of public undertakings conducted by such authorities.”
It will be noticed that the legislature is here authorized to limit the -municipal power of municipalities, if they see fit to do so, in certain respects, and they fall into two classes: (1) To levy taxes; (2) to incur debts for local purposes, and certain requirements as to. reports, etc. The very fact that that is the only limitation put upon municipalities as .to their municipal rule, invokes the old maxim: expressio unius est exclusio alterius. The very wording of this statute authorizing the legislature to limit the power concedes that the municipalities already have the power, but merely allows legislative regulation of the same in above respects.
If the above premises be true, the conclusion is irresistible that all municipal powers for local self-government, save the restriction to limit taxation and debt, as provided in Section 13 of the home-rule amendment, are now available to ¿11 municipalities in the state. The amendment is automatically self-executing, the executive or administrative powers to be exercised by the usual executive or administrative officers, and the legislative powers to be exercised by the council, which is made by statute the legislative body of municipalities.
The necessary legal and logical effect of the majority opinion in this case is to read into *140 Section 3 the words at the beginning of Section 2, to-wit: “General laws shall be passed to provide” that municipalities shall exercise all powers of local self-government, etc., or the clause “laws shall be passed.” The clause “as may be provided by law” and other similar expressions appear throughout these various amendments. The omission of it in Section 3 is strikingly significant.
The grand Old Roman, Judge Thurman, from whom I again quote, so rich in his rules of interpretation along the lines of common sense and the common law, used this language on page 623 of Cass v. Dillon, supra:
“Can it be believed” [which I quote with interpolation] “that, with the subject immediately before them,” [then making the constitution, then just having framed Section 2, which made it dependent on legislative action] “with a section framed to meet it under consideration,” [just having framed Section 2] “and with the strongest disposition to suppress the evil,” [emancipate cities and villages from legislative control as to their local municipal affairs] “so far as policy required, the convention, through mere carelessness, failed to expressly prohibit what they intended to forbid; nay, more, by a change of phraseology, as striking as it is singular,” [note the change between Sections .2 and 3, where in the former they provide for legislative control and in the latter omit it] “opened a wide door for saying no such prohibition was designed? Can it be believed that a prohibition so important was left to mere inference, when fewer words would have made it explicit, and' that, too, after it had been openly *141 asserted that the true inference was it did not exist ?”
The striking omission from Sections 3 and 7, and every other section of this home-rule amendment, of clear, apt words expressing a plain intention of requiring some prior affirmative action, either by the municipality adopting a charter or the legislature giving a further grant of power, especially when those matters were all before the convention, obviously shows the absence of any such purpose or intention.
Throughout the convention and the campaign for. the adoption of the constitutional amendments it was universally claimed that the home-rule amendment was automatically self-executing. What we know as men we can not unknow as judges. Construction of home rule must not lead to destruction of home rule.
The striking omission from Section 3 of legislative control as to municipal powers shows most clearly and conclusively that no legislative control as to the municipal power was in any wise intended and that the only control to be exercised was the state power as provided in the last half of that section. The majority opinion simply amends this whole section, makes it speak and mean what it never was intended to speak and mean, and is therefore simply judge-made constitution.
What was the spirit of 1911, that called for a new constitution?
What was the spirit of 1912, that framed and adopted the new constitution?
It was the spirit of Jefferson at Philadelphia, in 1776.
*142 It was the spirit of Lincoln at Gettysburg, in 1863.
It was the spirit of government for the people by the people.
And the convention wisely concluded that we could not get government for the people until we got government by the people. The legislature prevented such government of villages and cities for a century. Shall the courts now further prevent it for another century?
Would not the people have more confidence in our courts if our courts showed a little more confidence in the people?

Is a moving-picture theater a proper municipal public use?

What is a public use, and who may determine whether or not a given project is a public use?
Dillon on Municipal Corporations, at Section 21, Vol. I, Sth ed., says: “Cities and other municipalities in Great Britain are now to be found which own and operate street railroads, river steamboats, gas and electric light works, waterworks, markets, slaughter-houses, cold-air stores, ice manufactories, bathing establishments, lodging-houses, buildings for entertainments and for music, and engage in the sale and distribution of milk, brick-making, etc., the building and renting of dwellings for laboring ¿hen, and' other commercial and altruistic enterprises which, twenty years ago, were considered to be within the sphere of individual effort alone. The question whether it is expedient to embark in these enterprises has been referred to the people, and cannot be solved upon a philosophical or economic basis. Munic *143 ipalities have acquired the right to manage their own affairs, and the will of the voters, however mistaken, will determine what powers should be obtained and exercised. We therefore find an increasing diversity in the character of the public enterprises now undertaken by municipalities and a resulting complexity in their powers, rights, duties and obligations.”
Since we have in all cities the initiative and referendum, known as the Crosser law, it is up to the people to determine in the first instance whether or not they want to “embark in these enterprises.” They may permit the council to take the initiative, reserving the right to exercise the referendum upon the council’s action, but under their own power of local self-government; it being strictly a municipal purpose, or at least a purpose which affects nobody but those within the municipality, legislated for by the municipality, paid for and operated by the municipality, who else has any right but those within the municipality to object? And they have their day in court, before the council, and before the people at the time the vote is being had.
The old parent case, often referred to, as to who may determine whether or not it is a public use, is Goddin v. Crump, 8 Leigh R., 120, in which it is said: “If then the test of the corporate character of the act is the probable benefit of it to the community within the corporation, who is the proper judge whether a proposed measure is likely to conduce to the public interest of the city? Is it this court, whose avocations little fit it for such inquiries? Or is it the mass of the people them *144 selves—the majority of the corporation, acting (as they must do if they act at all) under the sanction of the legislative body? The latter, assuredly.”
Judge Ranney, in C. W. & Z. Rd. Co. v. Commissioners of Clinton County, 1 Ohio St., 95, uses this language: “In accomplishing the lawful purposes of legislation, it must be admitted, that the choice of means adapted to the end proposed, and not prohibited by the constitution, must be left exclusively to the discretion of the legislative body.”
Manifestly, if this be true as to the state’s legislative body, it must apply also to a municipal legislative body, unless prohibited by the constitution. Judge Ranney quotes with distinguishing approval the case of Goddin v. Crump, supra.
Manifestly, at least in. the first instance, a municipality has the right to determine that matter for itself, and should not be interfered with in the exercise of its municipal power or its municipal government, unless the power sought to be exercised be so glaringly and palpably beyond the powers of local self-government that a court should say that the power was unauthorized and unconstitutional.
In the light of modern-day development of our modern-day municipalities; in the light of what municipalities in almost every foreign nation have done; in the light of what American municipalities hope to do; in the light of the genuine home rule which they believe was provided for under the new constitutional amendment, I am entirely free and frank to say, the exercise of such power on the part of the city council of Toledo was en *145 tirely lawful, fully, authorized and ought not to be denied, in a case of this character, by this court.
The majority opinion written by Judge Shauck is a -most able presentation of the doctrine involved in the judgment and syllabus, and if amenable to criticism at all, it is because it seems to be assumptive rather than analytic and argumentative, dogmatic rather than discriminating or discursive. The most significant thing about it is not “what it does say,” but “what it does not say.”
Ordinarily in a question of interpretation or construction of any written instrument, whether it be a contract between parties to a lawsuit, a bond, a deed, a will, a statute, or a constitution, the first step is to ascertain the will, the intention, the purpose, of the parties to such writing—the will of the parties as 'expressed in the statute, or in the provision of the constitution in question. It is rather remarkable that in this opinion, the word “intention,” “purpose,” or “will,” is not even referred to, nor does any effort whatsoever seem to have been made to ascertain if possible from the language used what the intention, purpose or will of the constitution-makers, the delegates, or the constitution-adopters, the people, was in reference to the home-rule constitutional amendment. This rule of interpretation is so primary, so elementary, that certainly no authorities need be cited in support of it.
Two cases are cited in the majority opinion in support of the same. I want to call attention to them briefly.
*146 First, in Cass v. Dillon, supra, Judge Thurman says in the opinion: “The constitution did not create the municipalities of the state, nor does it attempt to enumerate their powers. It recognizes them as things already in being, with powers, that will continue to exist, so far as they are consistent with the. organic law, until modified or repealed. Thus, there is no express provision that a county may make a road, or contract a debt, yet no one will doubt for a moment that it may do both. Indeed, its power to contract debt is recognized, beyond even the authority conferred by law. It is clearly assumed in Section 5, of Art. 8, that it may create debts to repel invasion, suppress insurrection, or defend the state in war, although no such power has ever been conferred by statute, so far as I can discover. If it can thus incur debts, it may, of course, levy taxes to pay them; notwithstanding its only express grant of the taxing power is, by Art. 10, Sec. 7, for “police purposes.’ The same thing may be said of townships, cities, towns and villages.”
• I know of no better case in support of this dissenting opinion than the whole case of Cass v. Dillon, whether you read the majority opinion by Judge Thurman or the dissenting opinion by Judge Ranney. They both tell the same truth as to the political powers inherent in the people, in matters of local self-government in particular. I venture to stake this whole dissenting opinion upon this single case cited in the majority opinion.
In the dissenting opinion of Cass v. Dillon, Judge Ranney especially refers to the doctrine of delegated powers, which the majority opinion *147 seems to lose all thought of in citing State, ex rel., v. Guilbert, 56 Ohio St., 575. This is quoted as a reason why the state may not engage in the insurance business and, therefore, reasoning by analogy that it not being a proper public governmental purpose for the state, it must follow that a municipal picture show is not a proper public governmental purpose for a municipality, the court holding in the second section that the act providing for the registration of land titles in Ohio is repugnant to Section 19 of the Bill of Rights “because it attempts to authorize the taking of private property for uses that are not public, and without compensation.”
If the Guilbert case has any virtue at all it must be because of the fact that the state’s powers are all delegated powers, which the Fathers of the constitution and the jurists of early days all recognized as absolutely binding upon them. And there being no authority delegated in that constitution to engage in such business, it was therefore unlawful and unconstitutional.
But that cannot apply in the case of municipal government, because, as Judge Thurman has stated in the Cass v. Dillon case, municipal governments antedated state governments and national governments and exercise their common law powers with which they came into the state. The state constitution simply recognized them as in existence and •operation, and there is nothing in the state constitution in any wise denying or limiting those powers, save and except’ as heretofore referred to in this opinion.
*148 I shall not make any further comment on the majority opinion save to say that I am entirely unable to see the relevancy of the “flood” argument.
As to the suggestion that if a moving-picture show were urged as a proper educational use it would be a matter for the board of education, I think it is sufficient to answer that if this doctrine be followed to its logical conclusion, it would result in the abolition of all public libraries owned and operated by the many municipalities of the staté.
Coünsel on both sides having advised the court to disregard the emergency feature of the ordinance, and the court having therein concurred, it is unnecessary to discuss that question in this case.
Courts themselves are largely responsible for the widespread criticism of courts. They too often invade the provinces of administrative and legislative officers without right or authority of law or constitution. They too often claim the right of judicial independence without according to the other branches of the government their proper independence. But an invasion of the rights and powers of the people in the making of a constitution, under the guise of judicial interpretation, is, to put it mildly, seriously to be regretted by reason of its impairing and undermining a proper public confidence in the administration of justice. The courts above all others should be the first and foremost, not to destroy, but to defend, the people’s rights in their great ¡charter of liberties, the Ohio constitution.
*149 The honored Harlan, of the supreme court of the United States, in the Standard Oil and Tobacco Trust cases, rendered a not only distinguished but immortal dissenting opinion. In that opinion the court’s judgment was most severely criticised because of judge-made law in amending the Sherman act, under the mask of interpretation.
“After many years of public service at the National 'Capital, and after a somewhat close observation of the conduct of public affairs, I am impelled to say that there is abroad in our land, a most harmful tendency to bring about the amending of constitutions and legislative enactments by means alone of judicial construction. * * * To overreach the action of Congress merely by judicial construction, that is, by indirection, is a blow at the integrity of our governmental system, and in the end will prove most dangerous to all. Mr. Justice Bradley wisely said, when on this bench, that illegitimate and unconstitutional practices get their first footing by silent approaches and slight deviations from legal modes of legal procedure. Boyd v. United States, 116 U. S., 616, 635. We shall do well to heed the warnings of that great jurist.” Standard Oil Co. v. United States, 221 U. S., 104.
I regret that I am unable to adequately express my hearty endorsement of the wise and wholesome policy announced by Judge Harlan. If Judge Harlan’s dissent- is just condemnation of judge-made law, what is the proper' measure of just condemnation of judge-made constitutions? The judge-made statute can be easily and readily amended, but the judge-made constitution is as *150 permanent as the people-made constitution, and more, for- it will probably have more protection from the- courts.
Constitutional provisions are--too often devitalized .in t.he name of judicial construction. They are too often bled to death and nullified by judicial order and. decree. Of what avail is the legislative or- constitutional act if the teeth be all pulled out of it by judicial interpretation? The doctrine announced in the case at bar has not yet become the settled law of the state of Ohio. I have discussed this, question at so great length, because I still indulge the hope that this court, with the aid of an enlightened public opinion, may finally settle the law. along the lines of old landmarks, that all political power is inherent in the people and should be exercised by all branches of the government, not to destroy, but to defend, the people’s rights and protect the people’s powers.